OPINION
{¶ 1} William K. Sapp appeals from his convictions and sentences in the Clark County Common Pleas Court on nine counts of aggravated murder with death penalty specifications, two counts of attempted aggravated murder, four counts of rape with force specifications, four counts of kidnapping, three counts of tampering with evidence, and three counts of abuse of a corpse. Sapp advances fifteen assignments of error in which he alleges numerous prejudicial errors arising from the time of his arrest and questioning through the penalty phase of his capital-murder trial.
 {¶ 2} In early 1996, during an investigation by the Clark County Sheriff's Office on a matter unrelated to this case, officers learned of Sapp's involvement in a crime in Jacksonville, Florida. On September 26, 1996, Det. Robert A. Hinson from the Jacksonville Florida Sheriff's Office interviewed Sapp on the matter. During the interview, Sapp referred to an attack on a Springfield woman. Det. Hinson quickly left the interview room and returned with Sgt. Al Graeber of the Springfield Police Department, who was familiar with the Springfield case.
 {¶ 3} Sapp provided the officers with information about his attempted murder of Hazel Pearson. After more investigation, Sapp was linked to the murders of Phree Morrow and Martha Leach. The semen found in Morrow and Leach was tested and compared to DNA samples obtained from Sapp after his interview. It was determined that Sapp was the owner to a reasonable degree of certainty of the DNA samples extracted from both Morrow and Leach.
 {¶ 4} Sapp was interviewed on April 2-3, 1997 by Sgt. Graeber and Det. Stephen L. Moody of the Springfield Police Department. Sapp waived his rights several times during the course of the interview. During the interview, which was videotaped, Sapp confessed to the crimes against Morrow and Leach. Sapp also confessed to the murder of Belinda Anderson and the attempted murder of Hazel Pearson. Sapp provided details of the events leading to each of the crimes that were consistent with evidence that had been recovered from the crime scenes and corroborated the details of Sapp's confession.
 {¶ 5} On April 7, 1997, the Clark County Grand Jury returned a twenty-seven-count indictment against Sapp; twenty-five counts of which are at issue in this case. Sapp pled not guilty to the charges. Following the trial court's disposition of numerous motions, including a motion to sever, a motion to suppress, a motion to dismiss the death penalty specifications on constitutional grounds, and a motion for a hearing to determine competency, all of which the trial court denied, Sapp's jury trial began on September 13, 1999. The evidence, including portions of Sapp's videotaped confession, established the following.
 The Murder of Phree Morrow and Martha Leach {¶ 6} On August 22, 1992, Phree Morrow, twelve years old, and her friend Martha Leach, eleven years old, had spent the day together playing near their homes in Springfield, Ohio. At approximately 5 p.m., Leach approached her mother, Jettie Whitt, and asked if she and Morrow could go to Shuler's Bakery, to which Whitt said yes.
 {¶ 7} Pamela Gooding and Neda Gillman, employees of Shuler's at that time, testified that Morrow and Leach had entered Shuler's, but their testimony conflicted as to what the girls had ordered. Gooding stated that the girls had entered the bakery with an unknown male and that the male had paid for their purchases. Gillman recalled the girls being by themselves. Several other witnesses placed the girls in the area around the bakery at approximately the same time. After leaving the bakery, Morrow and Leach walked to a nearby pond.
 {¶ 8} At approximately the same time, Sapp drove Jamie Turner, David Marcieszewski and his step-son John Balser, and Christopher Bibbs to get something to eat in the vicinity of the bakery. The group proceeded to the pond near the bakery, a location at which the group would occasionally gather.
 {¶ 9} At some point, Morrow called Turner "ugly" and insulted Balser by calling him a "fucking retard." Balser began shaking and stuttering, which quickly erupted into crying. Turner slapped Morrow, and Sapp quickly followed. Sapp continued to hit Morrow, and the others joined him.
 {¶ 10} During the incident, Marcieszewski's wife Wanda arrived at the scene with her nephew, Ralph DePriest. Wanda screamed at Marcieszewski for bringing her son, Balser, to the pond with the girls. At some point Wanda removed a necklace from Leach's neck. The necklace was later recovered from Wanda's home.
 {¶ 11} Morrow fell to the ground, and the group held her down while Sapp cut her flowered shorts with a knife by splitting the seams of the leg and the crotch and then cutting the fabric across the abdominal area from the zipper to the right lateral seam of the shorts. Marcieszewski removed Leach's clothes. Sapp instructed Morrow to lay on her stomach and had Leach lay on top of Morrow. Sapp raped Leach, then the group took turns molesting her.
 {¶ 12} The group then turned the girls onto their stomachs, faces in the dirt, and took turns throwing rocks onto the backs of the girls' heads. All of the men struck each girl with a rock one time, except Sapp, who hit Morrow with a rock a second time after realizing she was not yet dead. DePriest testified that he had watched Sapp hold a large rock high above Morrow's head and had thrown it down onto the girl with a great amount of force. Sapp then raped Morrow.
 {¶ 13} Sapp took charge of cleaning up the scene. Two wooden pallets were placed over the bodies, and the men gathered brush to cover the pallets. The men collected the girls' clothes, shoes, and bicycle, and drove the personal belongings to a nearby storm sewer commonly referred to as "the Lion's Cage." Marcieszewski and Sapp carried the belongings down into the sewer and left them there. Sapp carefully wrapped Morrow's shorts around a rock to ensure that the shorts would not emerge and be discovered. Before leaving the Lion's Cage, the men wiped down the bars leading into the sewer and were careful not to leave behind any other evidence. With Sapp in charge, the group discussed how they would handle questions in order to ensure that their stories were similar but not exactly the same. Additionally, DePriest testified that before leaving the group, Sapp had told DePriest that he would kill him if he ever told anyone what he had witnessed. Under the circumstances, DePriest believed him.
 {¶ 14} On August 23, 1992, Kyle Cox and his little brother were riding their bikes around the pond when they discovered the bodies of Morrow and Leach underneath the wooden pallets and covered with brush. They rode to Shuler's Bakery and encountered a fireman, who returned with the boys to the scene.
 {¶ 15} When law enforcement authorities arrived at the scene, they saw two bodies covered by brush and two wooden pallets. The heads of the bodies were positioned in holes in the ground, and a large rock had been placed on Morrow's head. Officers investigated the area located near the pond, including the Lion's Cage. There, officers found the girls' bicycle, Morrow's shorts, and a brick located near the shorts.
 {¶ 16} Robert Stewart, Deputy Coroner for Clark County and Pathologist for the Mercy Medical Center, performed the autopsies on the girls. Stewart determined that both girls died as a result of multiple blunt trauma to the head. Stewart concluded that the girls' skull fractures were the result of force equivalent to that of an individual free-falling from a second story window and landing directly on the head. Additionally, sperm was detected in both girls' vaginas, and Stewart opined that the girls had been raped within twenty-four hours of their death.
 {¶ 17} The initial investigation of the crimes revealed the involvement of Marcieszewski and Wanda, Balser, Bibbs and Turner. It was not until Sapp's confession in 1997 that authorities became aware of his involvement in the crime.
 The Murder of Belinda Anderson {¶ 18} On September 7, 1993, Belinda Anderson left her home in Bellefontaine, Ohio to visit her sister, Debra Anderson, in Springfield, Ohio. On September 8, 1993, Belinda and Debra spent the day together. At about 5:20 p.m., Debra left to go to her parents' home to get money for cigarettes while Belinda stayed at Debra's house. When Debra arrived home at approximately 6:00 p.m., Belinda was not there. Belinda left a note saying that she had left to make a telephone call. Belinda never returned. Belinda had been wearing a purple silk short-sleeved shirt and sweat pants under a pair of shorts.
 {¶ 19} During his confession, Sapp referred to the murder of Anderson by his stating "it wasn't the pants this time. It was the goddamn tennis shoes." Sapp encountered Anderson on the afternoon of September 8, 1993, as she walked near his house. The two talked for a while and Sapp learned that she had left her brother's house in Bellefontaine to visit her sister in Springfield. They walked and talked for a long time. Sapp believed she was a prostitute, and asked her if she "dated." After making sure that Sapp was not a police officer, Anderson replied "usually how about [forty] bucks."
 {¶ 20} Sapp led her through an alley and instructed Anderson to crawl through a hole into a garage. Sapp handed Anderson the money, and she performed fellatio on him. At some point, Anderson decided she did not want to have sexual intercourse with Sapp. Sapp became angry, and Anderson struck Sapp. Sapp grabbed a piece of pipe, approximately five feet in length, and swung it at Anderson, striking her in the side of the head. Anderson began to get up and threatened Sapp that she would come after his wife and children while he was in jail for doing this to her, and he again started swinging the pipe, hitting her in the back, shoulder, and face.
 {¶ 21} After Anderson was dead, Sapp left his "signature" by removing her pants with his knife, "[j]ust like opening up a Christmas present. Some kids tear it open. Me, as a kid, I used to make sure to take the tape off, unfold it, fold by fold." He disposed of the jogging pants and his shirt in a nearby dumpster.
 {¶ 22} During the next couple days, Sapp returned to the garage to clean up the crime scene. He placed Anderson's body in two large plastic bags, dug a hole in the garage floor, and placed the body into the shallow grave. He covered up the body with dirt and some of the debris left in the garage. He was unsuccessful at covering Anderson's shoes.
 {¶ 23} Two years later, on July 8, 1995, Mary Williams and Raymond Calkins decided to clean out the garage of their home which they had purchased the previous year. Prior to their purchase, the house had been vacant for quite some time and the garage had been in a severe state of disrepair. As Williams was removing some of the garbage left by the previous owners, she noticed a pair of tennis shoes on the floor of the garage. Williams attempted to remove the shoes and quickly discovered that there was "something in the shoe." Williams ran from the garage and brought back her boyfriend, Calkins. Calkins entered the garage to investigate, and found a foot and a leg attached to the shoe. They called 911.
 {¶ 24} The Springfield police were contacted and Anderson's body was removed from the garage. Forensic pathologist and deputy coroner for the Miami Valley Coroner's Office Lee Lehman examined Anderson's body. Lehman determined that Anderson had died from significant trauma to the head and neck area. The amount of impact which occurred was similar to a "chop wound," such that a heavy instrument with a sharp edge had been swung with a considerable amount of force, chopping through the skin and bones of the skull and separating those bones. Due to the decomposition of the pelvic organs, Lehman was unable to determine if Anderson had been raped.
 The Attempted Murder of Hazel Pearson {¶ 25} On December 7, 1993, Hazel Pearson and her boyfriend, John Morgan, Jr., went to John's Bar on Selma Road in Springfield, Ohio. They had several drinks when Morgan's ex-girlfriend entered the bar. Morgan, whose nickname is "Butch," attempted to introduce his ex-girlfriend to Pearson. Pearson became upset and left the bar alone. At trial, Hazel explained that from this point she was unable to recall anything until the point when she awoke in the hospital several days later, with the exception of a brief recollection of crawling to the railroad tracks.
 {¶ 26} Both Sapp and Pearson lived near John's Bar. After leaving the bar, Pearson encountered Sapp. They struck up a conversation and walked in the direction of a nearby dock and railroad tracks. Sapp explained to law enforcement officials that Pearson had been very upset about Butch drinking with a woman or a girlfriend, and Pearson had left the bar. According to Sapp, when he and Pearson reached the railroad tracks, Pearson suddenly turned to him, told him she liked him, and kissed him. At some point, Pearson became upset and stated "why is it that all men, you know, got to have that stubble shit. Just like Butch." Pearson slapped Sapp. Sapp quickly became violent, hitting and kicking Pearson. Sapp explained that the slap from Pearson triggered an uncontrollable rage, feeling that "[the] bitch needed to die. All bitches needed to die." Sapp grabbed some rebar and began swinging at Pearson, hitting her in the face and neck area. He stabbed her in the stomach with a knife, and came up behind her and slashed her neck from one side of the chin to the other. Sapp then cut Pearson's pants in his "signature" method, a process Sapp stated took seven to twelve minutes. He vaginally raped Pearson, but did not ejaculate.
 {¶ 27} Thinking that she was dead, Sapp tried to hide her body under the dock. He ran along the railroad tracks and ran through several alleyways and threw a fleece jacket into a dumpster. To dispose of the knife, Sapp threw it vertically into the air, embedding it in the roof of a church. The knife was discovered the next year. The steel cable used to beat Pearson was recovered several years later, on February 26, 1998, in a catch basin located near the crime scene.
 {¶ 28} Pearson was discovered on the morning of December 8, 1993, sitting on a concrete island in a parking lot at Clark State Community College. At approximately 8 a.m. that morning, John Welsey Watkins, Jr., who worked for New Method Packaging, was loading a truck when he noticed Pearson sitting in the parking lot. At first, he thought that Pearson looked like a clown. Approximately one hour later, Watkins mentioned Pearson's presence to a co-worker, who took a closer look and discovered that it was a woman who looked as though she was hurt. When they approached Pearson, they believed that she had been hit by a train from the nearby railroad tracks. Pearson's throat was slashed "ear too (sic) ear," her face and body were badly beaten, and she had rocks embedded in her flesh. Despite the frigid temperatures, Pearson was naked below the waist and was wearing only a shirt. As they walked up she stated "Help me." Watkins asked Pearson if she had been raped, and she nodded her head affirmatively.
 {¶ 29} Ernest Whitehead, a paramedic for the City of Springfield's Fire Department, responded to the scene at approximately 10:48 a.m. He stated that Pearson was so badly disfigured from the beating and bruising that he could not discern her race. Cuts on Pearson's legs and other portions of her body began to break open and she screamed in pain as paramedics lifted her. As they placed Pearson onto the cot, her head flipped backwards, opening the cut in her throat and exposing her trachea.
 {¶ 30} Pearson suffered severe injuries. She had an open laceration with a depressed skull fracture above and behind her right ear which had pushed bone fragments into her brain. The bones in her face were severely fractured and were no longer connected. Pearson had swelling from blood pooling on the surface of her brain as a result of a subdural hematoma. She had a five-inch cut across her throat and a stab wound in her abdomen. Due to severe frostbite on her toes, gangrene set in and several of Pearson's toes had to be amputated. A rape kit was performed on Pearson, but no semen was detected.
 {¶ 31} Upon examination of the crime scene, a pair of pants were discovered upon which Pearson had been sitting when she was first detected. The pants were cut in Sapp's "signature" method along the edge of the left leg seam, such that the seam had been removed by a sharp instrument. The crotch seam was cut in a similar manner, and there was a "horizontal cut from the zipper straight across to the left lateral seam."
 {¶ 32} Additional evidence was produced by the State regarding statements made by Sapp after his indictment and prior to his trial that were indicative of guilt. James Hollopeter, a Clark County Sheriff's Office deputy who worked in the jail on or about April 17, 1997, overheard a conversation on that day between Sapp and James Hancock, another inmate. Sapp was brought up with shackles on his legs and his wrists, and Hancock commented that he "must be somebody important to be put in leg shackles." Sapp replied, "I'm gonna make national news. * * * I've killed several people, but mostly it's about two little girls . . . But God forgives me for it now because I've been saved."
 {¶ 33} After Sapp's pre-trial hearing on June 29, 1998, Sapp made two comments in front of two Clark County Sheriff's Office deputies about having killed people.
 {¶ 34} At trial, Johnny R. Saxour testified to conversations he had with Sapp while incarcerated at the Clark County Jail during June and July of 1998. Saxour was in jail for a probation violation and had been placed in the isolation unit for health reasons. Sapp made statements to him about the murders of Morrow, Leach and Anderson, and the attempted murder of Pearson. Sapp told Saxour that "whenever he got for (sic) the taste of blood, he said he always took care of his problems, he always went out, took care of his problems." He mentioned that he "had got a taste for blood" when he ran into Anderson, and he had taken her into a garage, beat her, "used a jar of Vaseline on her" and raped her, then "stuck her underneath the floor."
 {¶ 35} The State also produced testimony regarding writings in some of the prison's library magazines made by Sapp while he was incarcerated, indicative of his preoccupation with sexual killings. Additionally, the State produced evidence of a letter Sapp had written to a woman in which he had threatened to rape and kill her.
 {¶ 36} At the conclusion of the State's evidence, Sapp moved for a directed verdict under Crim.R. 29. The trial court denied the motion. Sapp rested without presenting any witnesses. Jury deliberations began on October 8, 1999. Later that day, the jury found Sapp guilty on all counts and specifications.
 {¶ 37} The mitigation phase of the trial began on October 18, 1999. Upon the State's motion, the trial court admitted the State's evidence, exhibits, and testimony from the guilt-phase portion of Sapp's trial as the State's case in chief for the mitigation portion. Sapp presented testimony from a variety of witnesses, and the State presented rebuttal testimony. The jury found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt and recommended a death sentence based upon the aggregate murders of Morrow, Leach and Anderson.
 {¶ 38} The trial court accepted the jury's recommendation, and on October 21, 1999, Sapp was sentenced to death for the murders of Morrow, Leach and Anderson. He was also given life imprisonment sentences for the rapes of Leach and Morrow, sentences of a minimum of ten years and a maximum of twenty-five years for the remaining rape convictions, sentences of a minimum of ten years for the tampering with evidence convictions, sentences of eighteen months for the abuse of a corpse convictions, and a term of a minimum of ten years and a maximum of twenty-five years for the attempted aggravated murder conviction. The trial court ordered all terms to be served consecutively. Additionally, Sapp was found to be a sexual predator. The trial court journalized its entries for sentencing and Sapp's convictions. Sapp now appeals to this court, asserting fifteen assignments of error.[1]
Sapp's first assignment of error:
 {¶ 39} The trial court erred to the prejudice of Mr. Sapp by denying his motion to suppress oral statements to police officers taken in violation of his due process rights guaranteed under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and the Ohio Constitution.
 {¶ 40} Preliminarily, we note that the following standard governs our review of a trial court's decision regarding a motion to suppress: "[W]e are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." State v. Retherford (1994), 93 Ohio App.3d 586,592, 639 N.E.2d 498.
 {¶ 41} Sapp argues that the trial court erred in denying his motion to suppress for several reasons, resulting in violations of his due process rights under the Ohio and United States constitutions. Sapp first argues that his Sixth Amendment rights were violated when police officers questioned him about the facts of this case, despite his having been represented by counsel on concurrent, unrelated matters. Sapp notes that several of the police officers who participated in his questioning were aware that he had recently completed a trial in which he had been represented by counsel; however, they did not seek advice whether counsel should have been notified. We disagree with Sapp's reasoning and find noSixth Amendment violation.
 {¶ 42} The Sixth Amendment, as applied to the states through theFourteenth Amendment, guarantees that an accused in a criminal case shall enjoy the right to have the assistance of counsel for his defense. McNeilv. Wisconsin (1991), 501 U.S. 171, 175, 111 S.Ct. 2204. TheSixth Amendment right to counsel attaches once adversarial judicial criminal proceedings have commenced against the accused. Kirby v. Illinois (1971),406 U.S. 682, 688, 92 S.Ct. 1877. The Kirby court clarified that the initiation of adversarial judicial proceedings include "formal charge, preliminary hearing, indictment, information, or arraignment." Id. at 689. The Sixth Amendment provides a right to counsel at all critical stages of the proceedings once the right has attached and has been asserted by the accused, especially "if the case is one in which a death sentence may be imposed." Spano v. People of the State of New York
(1959), 360 U.S. 315, 327, 79 S.Ct. 1202 (concurring opinion by Justice Stewart).
 {¶ 43} The Ohio Supreme Court noted in State v. Hill,73 Ohio St.3d 433, 653 N.E.2d 271, 1995-Ohio-287, that "an accused'sSixth Amendment right is offense specific. Thus, under McNeil [v.Wisconsin, 501 U.S. 171], appointment of counsel with respect to one offense does not bar police questioning as to a second, uncharged offense." Id. at 446. See, also, Texas v. Cobb (2001), 532 U.S. 162,121 S.Ct. 1335, 1340. In State v. Johnson, 88 Ohio St.3d 95, 2000-Ohio-276, the court reiterated this theory and found that police questioning of an accused did not qualify as a violation of his Sixth Amendment right to counsel simply because he had been formally charged and had secured counsel regarding another offense committed against another victim. Thus, the Sixth Amendment right to counsel cannot be invoked once for all future prosecutions. Texas v. Cobb, supra.
 {¶ 44} In the instant case, Sapp was brought in for questioning after having been convicted and sentenced in an unrelated case with a different victim. There is no evidence that the facts of the previous case were related in any way to the facts in this case, and Sapp does not allege them to be related. The police did not question him on matters relating to the previous case, and at no time during the interview process did Sapp request that he speak to his attorney from that case or any other attorney. Additionally, since no adversarial judicial proceedings had commenced against Sapp, the Sixth Amendment right to counsel was not implicated in this matter and we find no violation stemming from when he gave his statement to the police.
 {¶ 45} Sapp also contends that he did not knowingly, intelligently and voluntarily waive his Fifth Amendment right to remain silent.
 {¶ 46} The Fifth Amendment, as applied to the states through theFourteenth Amendment, provides procedural safeguards to protect an accused from self-incrimination. Miranda v. Arizona (1966), 384 U.S. 436,86 S.Ct. 1602. The police must inform the accused, prior to interrogation, of the rights to remain silent and to legal counsel. Id. Once Miranda warnings are given, statements that are the product of interrogation must be suppressed unless the accused explicitly waives his Miranda rights and consents to the interrogation. Id. In the instant matter, Sapp does not argue that the Miranda warnings were improperly administered or that he did not understand those rights. Rather, he argues only that his waiver was made involuntarily.
 {¶ 47} An accused may voluntarily waive the Fifth Amendment right against self-incrimination. "A suspect's decision to waive his privilege against self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." State v. Otte,74 Ohio St.3d 555, 562, 1996-Ohio-108, citing Colorado v. Connelly
(1986), 479 U.S. 157, 167, 107 S.Ct. 515. See, also, State v. Dailey
(1990), 53 Ohio St.3d 88, 559 N.E.2d 459, paragraph two of the syllabus.
 {¶ 48} The concern prompting the adoption of the Fifth Amendment was that coerced confessions are inherently untrustworthy. Dickerson v.United States (2000), 530 U.S. 428, 120 S.Ct. 2326. "`A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt . . . but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape . . . that no credit ought to be given to it; and therefore it is rejected.'" Id. at 433, quoting King v.Parratt (N.P. 1831), 4 Car. P. 570, 172 Eng. Rep. 829.
 {¶ 49} Whether a confession is voluntary depends upon "the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." State v. Edwards (1976),49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus, vacated on other grounds, (1978), 438 U.S. 911. This determination "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." Dickerson v.United States, 530 U.S. at 434, quoting Stein v. New York (1953),346 U.S. 156, 185, 73 S.Ct. 1077.
 {¶ 50} In this instance, Sapp does not dispute that he was read each of his rights several times during the interview process or that he was repeatedly asked if he understood these rights. He does not dispute that he acknowledged that he understood each of the rights as read to him or that he conveyed such to the interrogating officers. He contends, however, that the circumstances surrounding the interrogation made his confession involuntary. Specifically, Sapp asserts that his mental health issues coupled with the length of the interview process suggest that police tactics amounted to coercion, and thus his confession was involuntary.
 {¶ 51} Although at first glance the length of the custodial interview appears to be unreasonable, as it occurred over the span of several days, we do not find this alone to be coercive. First, this was not a case in which Sapp, who wanted to speak with the police, would be able to tell his story in a matter of hours. This case involves four complex incidents, three of which were murders, and Sapp spent a great length of time explaining what had occurred in each of the crimes. Second, there were numerous breaks during which Sapp was permitted to go to the restroom, given medication, food and beverages, and provided with the opportunity to rest or sleep for the night. The intensity of the questioning varied; however the interview did not consist of the officers pummeling Sapp with questions for hours in an effort to break his will and get him to confess. Sapp had a great deal to say, and it took a great deal of time to say it. Third, many times throughout the interview officers reiterated to Sapp that it was his choice to speak, or Sapp had mentioned that he was voluntarily choosing to speak with the officers. He remained rational throughout the course of the interview. We cannot find that there was coercion under these circumstances.
 {¶ 52} Finally, Sapp asserts that his confession was involuntary because law enforcement took advantage of his bipolar mental condition by allowing him to waive his rights and speak with them. We do not agree. This court noted in State v. Phillips (Aug. 11, 2000), Montgomery App. No. 18049, that a "suspect's impaired mental condition at the time of the waiver and the confession has some bearing on the issue of the voluntariness but only as to whether police officers deliberately exploit the suspect's mental condition to coerce the waiver and confession." In this instance, Det. Moody and Sgt. Graeber went to great lengths to ensure that Sapp's psychological issues were dealt with during the interview process. Dr. James P. Gibfried was called to examine Sapp, and medication was provided to him for his mental issues. Sapp was given his regular dose of Lithium and Prozac to address his mental health issues. We see no evidence in the record to indicate that law enforcement deliberately exploited Sapp's mental condition to obtain a waiver of rights or confession.
 {¶ 53} In the case at bar, the totality of the circumstances demonstrate that Sapp voluntarily gave his statements to law enforcement officers. Accordingly, his first assignment of error is overruled.
Sapp's second assignment of error:
 {¶ 54} Trial counsel were ineffective in failing to request from the trial court findings of fact and conclusions of law with regard to the motion to suppress in violation of his Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the Ohio Constitution.
 {¶ 55} The trial court in this instance failed to make findings of fact when it overruled Sapp's motion to suppress. Sapp asserts ineffective assistance of counsel due to the failure of his trial counsel to seek findings of fact and conclusions of law pursuant to Crim.R. 12(E).
 {¶ 56} The claim of ineffective assistance of counsel requires a two-prong analysis. To prevail on a claim of ineffective assistance of counsel, a defendant must show both deficient performance and resulting prejudice. Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052. To demonstrate deficiency, a defendant must show that counsel's representation fell below an objective standard of reasonableness. Id. at 688, 104 S.Ct. at 2064. Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. Id. The adequacy of counsel's performance is reviewed in light of all the circumstances surrounding the trial. Id. "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time." State v. Cook (1992),65 Ohio St.3d 516, 524-25, 605 N.E.2d 70. Assuming that counsel's performance was ineffective, the defendant must still show that the error had an effect on the judgment. State v. Bradley (1989), 42 Ohio St.3d 136,142, 538 N.E.2d 373. Reversal is warranted only where the defendant demonstrates that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Id.
 {¶ 57} Sapp asserts that the absence of findings of fact and conclusions of law hampers his ability to obtain "meaningful direct and * * * collateral review" and that he was prejudiced by trial counsel's failure to request such because there was not evidence in the record to support the trial court's decision. This assignment of error lacks merit.
 {¶ 58} Crim.R. 12(F)[2] mandates that a trial court state its essential findings on the record when factual issues are involved in determining a motion to suppress. In order to invoke this provision, trial counsel must request the trial court to state its essential findings of fact on the record. State v. Benner (1988), 40 Ohio St.3d 301,317, 533 N.E.2d 701. While it is error for the trial court to fail in providing requested findings of fact, is not prejudicial where the record provides an appellate court with a sufficient basis to review the assignments of error. Id. at 317-318.
 {¶ 59} Here, although the record is devoid of the trial court's findings of facts, the record is sufficient to allow a full review of Sapp's claim on appeal regarding his motion to suppress. The transcript and exhibits from the motion to suppress hearing provide this court with a sufficient basis to determine whether the trial court's decision was supported by competent, credible evidence.
 {¶ 60} We find that Sapp suffered no prejudice from his counsels' failure to ask for Crim.R. 12(F) findings, as the record supports the trial court's conclusion that Sapp had failed to establish grounds for his suppression motion.
 {¶ 61} Sapp's second assignment of error is overruled.
Sapp's third assignment of error:
 {¶ 62} The trial court erred to the prejudice of Mr. Sapp by denying his pre trial motion for severance in violation of his due process rights guaranteed under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the applicable portions of the Ohio Constitution.
 {¶ 63} Sapp argues that the trial court should have granted his pretrial motion to sever the counts relating to the murders of Morrow and Leach from the counts relating to the Anderson murder and the count relating to the Pearson attempted murder. While Sapp seems to concede that the Morrow and Leach murders were "one crime" and should have been tried together, he claims that the attempted murder of Pearson and the murder of Anderson were separate crimes in and of themselves, and should have been tried separately, as there were three separate incidents in terms of time, place and type of victims. Furthermore, Sapp contends that he was unduly prejudiced by the joinder of all three incidents because it "is clear * * * that the prosecution was able to use evidence of each crime to bolster its chances on the other, with the result of convictions, that later lead to the imposition of the death penalty."
 {¶ 64} Preliminarily, we note that a motion for severance of counts due to prejudicial misjoinder is waived unless it is renewed at the close of the state's case or at the conclusion of all the evidence.State v. Miller (1995), 105 Ohio App.3d 679, 691, 664 N.E.2d 1309, 1317
(citation omitted). Sapp did not renew his motion for severance at the conclusion of all of the evidence, thus he has waived all but plain error.
 {¶ 65} Crim.R. 8(A) permits joinder when the charged offenses "are of the same or similar character." "The rule allows the admission of other-acts evidence for purposes other than proving that the accused acted in conformity with a particular character." State v. LaMar,95 Ohio St.3d 181, 194, 2002-Ohio-2128, ¶ 51. Crim.R. 8(A) also allows joinder of two or more offenses that "are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." It is well-established that the law favors joinder because the avoidance of multiple trials conserves time and expense and minimizes the potentially incongruous outcomes that can result from successive trials before different juries. State v. Schiebel
(1990), 55 Ohio St.3d 71, 86-87, 564 N.E.2d 54; State v. Torres (1981),66 Ohio St.2d 340, 343, 20 O.O.3d 313, 421 N.E.2d 1288.
 {¶ 66} A defendant may only move to sever counts under Crim. R. 14 if he can show actual prejudice from the joinder of the counts. State v.Lott (1990), 51 Ohio St.3d 160, 163, 55 N.E.2d 293. A trial court's decision denying severance will only be reversed if the trial court abused its discretion. Id. The state can negate the defendant's claim of prejudice in two different ways. Under the first method, referred to as the "other acts" test, the state must demonstrate that the evidence to be introduced at the trial of one offense would also be admissible at the trial of the other severed offense under the "other acts" portion of Evid.R. 404(B). Id.; Miller, 105 Ohio App.3d at 691; State v. Van Sickle
(1993), 90 Ohio App.3d 301, 305, 629 N.E.2d 39. Under the second method, referred to as the "joinder test," "the state is not required to meet the stricter `other acts' admissibility test, but is merely required to show that evidence of each crime joined at trial is simple and direct." (Citations omitted.) Lott, 51 Ohio St.3d at 163. The purpose of the "joinder test" is to prevent the jury from confusing the offenses or from improperly cumulating the evidence of the various crimes. Van Sickle,90 Ohio App.3d at 307, citing Lott, 51 Ohio St.3d at 163-164. The "joinder test" "focuses on whether the trier of fact is likely to consider `evidence of one [offense] as corroborative of the other'." (Citation omitted.) State v. Wiles (1991), 59 Ohio St.3d 71, 77, 571 N.E.2d 97.
 {¶ 67} In this instance, the trial court did not abuse its discretion by denying Sapp's motion to sever because the State had satisfied both tests. Had the State tried all three crimes separately, the evidence of Sapp's participation in all three crimes would have been admissible in each trial under Evid.R. 404(B). In this case, as in LaMar, 95 Ohio St.3d 181, the indictment contained R.C. 2929.04(A)(5) specifications alleging that Sapp had murdered Morrow, Leach and Anderson, and had attempted to murder Pearson as part of a "course of conduct" that involved the "purposeful killing of or attempt to kill" two or more persons. Even if the counts would have been tried separately, the State would have had to present some evidence of each of the crimes in order to prove the specifications. Thus, as in LaMar, there would have been a valid non-character purpose for admitting evidence of the other crimes. LaMar, 95 Ohio St.3d at 199, 2002-Ohio-2128 at ¶ 51. (Citations omitted.)
 {¶ 68} Furthermore, the Supreme Court has found that "other acts" are admissible to show modus operandi. The Court stated in State v.Lowe, 69 Ohio St.3d 527, 531, 1994-Ohio-345, "[o]ther acts may also prove identity by establishing a modus operandi applicable to the crime with which a defendant is charged. `Other acts forming a unique, identifiable plan of criminal activity are admissible to establish identity under Evid.R. 404(B).'" Id., citing State v. Jamison (1990), 49 Ohio St.3d 182,552 N.E.2d 180, syllabus.
 {¶ 69} As the State points out, Sapp committed or attempted to commit four murders. The crimes shared similar features which served as evidence to support the State's theory of the case, which is that Sapp violently beat his female victims in a secluded area; he removed the victims' pants in a "signature" manner; he raped his victims; he murdered or attempted to murder his victims; and he then "cleaned up" the crime scene and hid the bodies. Additionally, evidence of Sapp's modus operandi is important in this instance to negate defense counsel's theory that Sapp was not the principal offender in the Morrow and the Leach murders, and that the murder of Anderson and the attempted murder of Pearson were the result of provocation.
 {¶ 70} Even if the evidence for each victim would not have been admissible in the trial of the other victims under Evid.R. 404(B), this court believes that the evidence as to each count was direct and uncomplicated and capable of being segregated. There are three separate crimes in this case: the rapes and murders of Morrow and Leach on August 22, 1992; the rape and murder of Anderson on September 8, 1993; and the rape and attempted murder of Pearson on December 7, 1993. Although the crimes were very similar in that they consisted of a violent beating and a rape, the incidents were dissimilar enough in time, venue, and the weapon with which Sapp inflicted the beating.
 {¶ 71} Furthermore, the evidence provided for each crime was sufficiently "simple and direct" to negate Sapp's claims of prejudicial joinder. Although some officers who had been assigned to recover evidence, process the scene, or inventory the scene testified about several of the crimes, their testimonies regarding each were direct and were simple to follow. Such testimonies would not have led the jurors to confuse the offenses or improperly cumulate the evidence of the various crimes.
 {¶ 72} Accordingly, we do not find that the trial court abused its discretion in denying severance, and no plain error occurred therefrom. Sapp's third assignment of error is overruled.
Sapp's fourth assignment of error:
 {¶ 73} Trial counsel were ineffective in failing to renew their motion for severance at the close of the evidence and as a result denied Mr. Sapp his right to effective assistance of counsel and to due process in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the applicable portions of the Ohio Constitution.
 {¶ 74} In order to prevail on his claim of ineffective assistance of counsel, Sapp must show that his counsels' performance fell below an objective standard of reasonableness and that prejudice arose from his counsels' performance. See Strickland v. Washington, 466 U.S. 668,104 S.Ct. 2052; State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.
 {¶ 75} Having already determined that the evidence of each crime was simple, direct, and capable of being segregated, we conclude that there was no ineffective assistance of counsel arising from the failure to make or renew a motion for severance. Sapp's fourth assignment of error is, therefore, overruled.
Sapp's fifth assignment of error:
 {¶ 76} Neither the murder of Belinda Anderson nor the attack on Hazel Pearson were part of "a course of conduct involving the purposeful killing of or attempt to kill two or more persons."
 {¶ 77} Sapp asserts that the course of conduct specification regarding the Anderson murder and the Morrow and Leach murders should be reversed, as the Anderson murder and the Pearson attempted murder were separate and apart from the Morrow and Leach murders. Furthermore, Sapp urges this court to reverse the death penalty sentence as the jury improperly weighed all four crimes together in assessing the course of conduct specification.
 {¶ 78} According to the law as it existed prior to July 1, 1996, the "course of conduct" specification under R.C. 2929.04 stated, in pertinent part:
 {¶ 79} "(A) Imposition of the death penalty for aggravated murder is precluded, unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt:
 {¶ 80} * * *
 {¶ 81} "(5) Prior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender."
 {¶ 82} R.C. 2929.04(A)(5) does not, however, provide a definition for the term "course of conduct." In instructing the jury on how to determine if a "course of conduct" exists, the trial court referred to R.C. 2901.12(H) to define course of conduct, and instructed the jury as follows:
 {¶ 83} "Without limitation on the evidence which may be used to establish such course of conduct, the following is evidence of a course of criminal conduct:
 {¶ 84} "1) the offense involved victims of the same type or from the same group; and
 {¶ 85} "2) the offense involved the same or similar methods of operation."
 {¶ 86} Sapp concedes that the Morrow and Leach murders "can properly be understood as falling within the parameters of a course of conduct specification," as they occurred at the same time, same place, same manner, same circumstances and the same individuals were involved in the murders. Sapp urges that the Anderson murder and the Pearson attempted murder were not part of this same course of conduct, as the incidents occurred one year apart, under different circumstances, and in different manners than the Morrow and Leach murders. We are not persuaded.
 {¶ 87} The Ohio Supreme Court has held that an offense may be part of a course of conduct with other murder offenses despite the fact that the offenses occurred at different times and places. See, e.g., State v.Dunlap, 73 Ohio St.3d 308, 1995-Ohio-243 (course of conduct involved two murders of two victims in two states during a ten-day period); State v.Fautenberry, 72 Ohio St.3d 435, 1995-Ohio-209 (course of conduct involved five victims in four states during a five-month period); State v.Benner, 40 Ohio St.3d at 304-305 (course of conduct involved multiple victims during a several-week period).
 {¶ 88} Although the span of time at issue in this case is longer than any other Ohio case dealing with the course of conduct issue, we cannot conclude that Sapp's actions did not constitute a course of conduct simply because the incidents did not occur in a shorter time span. In fact, there is no evidence that the Ohio Legislature wanted to limit "course of conduct" in temporal or spatial terms.
 {¶ 89} In this case, a reasonable jury could have found that the circumstances surrounding the Anderson murder and the Pearson attempted murder were intertwined with the Morrow and Leach murders that took place approximately one year earlier. Several similarities tie the three murders and the attempted murder of Pearson together and suggest a common modus operandi. All four victims were female, and there is evidence that Sapp raped all four women during the attacks. Sapp violently attacked all four females, with all four victims having suffered severe head trauma. All of the incidents occurred in a secluded location, but in close geographical proximity to where Sapp lived. In each incident, Sapp carefully and deliberately removed the victims' pants in his "signature" method using his knife, and he attempted to hide their clothing. In all incidents, Sapp carefully dismantled the crime scene and attempted to clean the areas. With the exception of Pearson, he hid the bodies before leaving the area.
 {¶ 90} In his interview, Sapp mentioned that in all of the incidents, the victims had done or had said something to him that "set him off" into his violent behavior. Additionally, Johnny Saxour testified that during his stay with Sapp in the isolation wing of the Clark County Jail, Sapp had explained the murders to him by stating that whenever he "got a taste for blood," Sapp would "take care of it."
 {¶ 91} These similarities support the finding of a common modus operandi and motivation existing between all the incidents. Despite the murders and attempted murder occurring more than one year apart, the similarities demonstrated that Sapp had a plan, scheme, or design involving the violent crimes in this case. Therefore, the trial court did not err in submitting the course of conduct specification to the jury regarding these four crimes.
 {¶ 92} Incidentally, for the reasons we mentioned above, we do not agree that the death sentences in this case should be vacated because the jury considered more than just the murders of Morrow and Leach.
 {¶ 93} Sapp's fifth assignment of error is overruled.
Sixth assignment of error:
 {¶ 94} The jury wrongly concluded that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt.
 {¶ 95} Sapp contends that the jury erred by finding that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt.
 {¶ 96} A list of aggravating circumstances is provided in R.C.2929.04(A), of which two apply in this case: R.C. 2929.04(A)(5) and (7). R.C. 2929.04(A) states that an aggravating circumstance exists where:
 {¶ 97} "(5) * * * the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender.
 {¶ 98} * * *
 {¶ 99} or "(7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation or calculation."
 {¶ 100} According to R.C. 2929.04(B), "[i]f one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment or count in the indictment and proved beyond a reasonable doubt, and if the offender did not raise the matter of age pursuant to section 2929.023 * * * of the Revised Code or if the offender, after raising the matter of age, was found at trial to have been eighteen years of age or older at the time of the commission of the offense, the court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:
 {¶ 101} "(1) Whether the victim of the offense induced or facilitated it;
 {¶ 102} "(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;
 {¶ 103} "(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;
 {¶ 104} "(4) The youth of the offender;
 {¶ 105} "(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;
 {¶ 106} "(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;
 {¶ 107} "(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death."
 {¶ 108} In other words, the trial court and the jury are to weigh the aggravating circumstances proved beyond a reasonable doubt against the nature and circumstances of the offense, the defendant's history, character, and background, and the enumerated mitigating factors set out in R.C. 2929.04(B).
 {¶ 109} Sapp contends that the jury's verdict was unreliable because it (1) gave the course of conduct aggravating circumstance too much weight, as it should have been weighed as if it consisted only of the murders of Morrow and Leach; (2) the jury was instructed inaccurately on the R.C. 2929.04(A)(7) specification, as it expanded the specification into a rape and a course of conduct specification and thus increasing its weight; and (3) the jury was inaccurately told by the State that the felony rape specification was also an escape detection specification, a specification not present in this case.
 {¶ 110} First, we disagree with Sapp's argument that the course of conduct specification as an aggravating circumstance was to be weighed as if it consisted only of the murders of Morrow and Leach and not the murder of Anderson and the attempted murder of Pearson. As we stated in the previous assignment of error, there were many similarities in the modus operandi and the motivation of the murders. Accordingly, it was proper for the trial court to have the course of conduct specification encompass the crimes against all four victims.
 {¶ 111} Sapp's next contention is that the trial court erroneously instructed the jury regarding aggravating circumstances. Initially, we note that Sapp did not request different penalty instructions, nor did he object to the aggravating circumstance instructions given at trial. Sapp's "failure to object to a jury instruction constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise." (Citation omitted.) State v. Underwood (1983), 3 Ohio St.3d 12, 444 N.E.2d 1332, syllabus. We find that the trial court's penalty instructions did not rise to the level of plain error.
 {¶ 112} Regarding appellate review of jury instructions, the Supreme Court of Ohio has stated that "[a] jury charge must be considered as a whole and a reviewing court must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights." (Citations omitted.) Becker v. Lake Cty.Mem. Hosp. West (1990), 53 Ohio St.3d 202, 208, 560 N.E.2d 165.
 {¶ 113} According to Sapp, the following instruction expanded the R.C. 2929.04(A)(7) specification into a rape and course of conduct specification, and thus increasing its weight:
 {¶ 114} "The aggravating circumstances for each victim that you are to consider are as follows:
 {¶ 115} "The first aggravating circumstance is that the aggravated murders of Phree Morrow, Martha Leach, and Belinda Anderson were part of a course of conduct involving the purpose (sic) killing of or attempt to kill two or more persons by the Defendant.
 {¶ 116} "The second aggravated circumstance, that the Defendant was a principal offender in the commission of the aggravated murders of Phree Morrow, Martha Leach, and Belinda Anderson and said aggravated murders were committed while the Defendant was committing or attempting to commit rape.
 {¶ 117} "The other specifications by law merge with these specifications. Therefore, they cannot be considered by you as separate aggravating circumstances.
 {¶ 118} "The aggravated murder is not, itself, an aggravating circumstance. You may not consider the nature and circumstances of the crime, including the ages of the victims, as an aggravating circumstance. Rather, while deliberating on your verdict as to each victim, the two aggravating circumstances set forth above are all that you will consider when you are weighing the aggravating side of the scale."
 {¶ 119} We see no plain error in these instructions, and we cannot see how the language expands the specification into a rape and a course of conduct specification, resulting in the increase of weight to the specification. Instead, we find that the trial court clearly instructed the jury to consider the two aggravating circumstances separately and with respect to each victim.
 {¶ 120} Sapp also asserts that in closing, the State explained the R.C. 2929.07(A)(7) felony rape specification as if it were an escape detection specification under R.C. 2929.07(A)(3), a specification which had not been charged in this case. The result, according to Sapp, is that the jury's sentencing recommendations are unreliable.
 {¶ 121} The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused. State v. Lott, 51 Ohio St.3d at 165. Prosecutorial misconduct does not warrant a reversal unless the conduct deprived the defendant of a fair trial. State v. Apanovitch (1987),33 Ohio St.3d 19, 514 N.E.2d 394; State v. Keenan (1993),66 Ohio St.3d 401, 613 N.E.2d 203. In addition, the state is entitled to a certain degree of latitude in summation. State v. Treesh,90 Ohio St.3d 460, 466, 2001-Ohio-4; State v. Grant, 67 Ohio St.3d 465,482, 1993-Ohio-171; State v. Liberatore (1982), 69 Ohio St.2d 583, 589, 23 O.O.3d 489, 433 N.E.2d 561. The prosecutor may draw reasonable inferences during closing argument. State v. Smith, 80 Ohio St.3d 89,111, 1997-Ohio-355. We view the state's closing argument in its entirety to determine whether the allegedly improper remarks were prejudicial.State v. Moritz (1980), 63 Ohio St.2d 150, 157, 17 O.O.3d 92,407 N.E.2d 1268.
 {¶ 122} The portion of the State's closing argument which Sapp now claims as error deals with the prosecutor's opinion of why the legislature developed R.C. 2929.04(A)(5) into an aggravating circumstance. The prosecutor opined that the crime of rape was severe with stiff penalties, and that the legislature had provided additional protection to rape victims by creating this felony murder specification. Because the specification would deter a rapist from killing a victim to escape detection, the prosecutor suggested that the aggravating circumstance should be afforded great weight. Sapp objected at trial, and the trial court sustained the objection. The trial court provided an immediate curative instruction, stating, "Ladies and gentlemen, I would reiterate my original instruction to you that the comments being made during closing arguments are the opinions of the attorneys making the statements." Additionally, the trial court instructed the jury during the penalty phase that the closing statements made by the State were not evidence. The trial court proceeded again to review and explain the aggravating circumstances for each victim and how to weigh these circumstances.
 {¶ 123} In summation, although the statement about the intent of the legislature regarding the purpose of the aggravating circumstance had no basis, it was an opinion of the prosecutor, and the trial court instructed the jury to treat it as such. Accordingly, viewing the State's closing argument in its entirety, we find that the remarks were not prejudicial to Sapp.
 {¶ 124} Sapp's sixth assignment of error is overruled.
Seventh assignment of error:
 {¶ 125} The judge wrongly determined that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt.
 {¶ 126} In this assignment of error, Sapp contends that the trial court erred in its written sentencing opinion by (1) failing to state how it determined the weight to be afforded to the aggravating circumstances; (2) placing too much weight on the course of conduct specification by considering the murder of Anderson within the course of conduct specification; (3) considering a broader specification than proposed to the jury; and (4) failing to assign weight to the mitigating factor of mental health issues.
 {¶ 127} Whether the trial court properly stated how it determined the weight of the aggravating circumstances is arguable. Nevertheless, this court's independent sentence review of the aggravating circumstances and mitigating factors will correct this deficiency, if indeed it is a deficiency. State v. Lott, 51 Ohio St.3d at 170-173. We conclude that the trial court's failure to provide a more detailed analysis of the weight it afforded the aggravating circumstances is not prejudicial error, as the trial court analyzed each of the factors under R.C. 2929.04(A) and attempted to explain the weight afforded each factor.
 {¶ 128} Sapp next asserts that the trial court erred in finding that the course of conduct specification encompassed more than the murders of Morrow and Leach. Again, as we have stated previously, we see no error in the course of conduct determination, and we find no error in the trial court's decision relating to the course of conduct specification. Regarding Sapp's contention that the trial court did not consider the same aggravating circumstances as to which it had instructed the jury, we believe Sapp's argument focuses on the wording related to R.C. 2929.04(A)(7). As the trial court's opinion reflected the language as contained in R.C. 2929.04(A)(7), we overrule this portion of Sapp's assigned error.
 {¶ 129} Additionally, Sapp points out a typographical error in the trial court's analysis of Sapp's mental health issues, the mitigation factor under R.C. 2929.04(B)(3), resulting in the trial court "giv[ing] no weight to the factor because it was proved." For these reasons, Sapp argues, the trial court's sentence was unreliable and its sentence of death should be revoked.
 {¶ 130} We do find error in the trial court's sentencing opinion regarding the mitigating factor of Sapp's mental health issues; however, we believe it to only be a typographical error. The trial court stated the following, "The Defendant showed, by a preponderance of the evidence, that he suffers from a mental illness called a bi-polar mood disorder, and from an antisocial personality disorder. However, when taken into consideration with the nature and circumstances of these offenses and the evidence of his relationships with others, that it has been shown, by a preponderance of the evidence, that the mental disorders suffered by the Defendant resulted in a lack of substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law at the time he was committing these offenses. Therefore, the Court does not give this factor any weight in mitigation." (Doc. No. 164, p. 5.)
 {¶ 131} We believe the trial court omitted or added a word in the decision which resulted in a typographical error. Although the trial court considered this factor, we are uncertain of the exact amount of weight the trial court afforded to the factor. Again, we note that our independent review of Sapp's sentencing is sufficient to cure this alleged deficiency in the trial court's entry. See State v. Murphy
(1992), 65 Ohio St.3d 554, 559, 605 N.E.2d 884; State v. Maurer (1984),15 Ohio St.3d 239, 247, 473 N.E.2d 768. Accordingly, we find that such error is not reversible error, and we overrule Sapp's seventh assignment of error.
Sapp's eighth assignment of error:
 {¶ 132} In conducting its own independent weighing of the aggravating circumstances against the mitigating factors, this court should conclude that the mitigating factors are not outweighed beyond a reasonable doubt.
 {¶ 133} We will consider this argument in our independent review of Sapp's death sentence.
Sapp's tenth assignment of error:
 {¶ 134} The first phase jury instructions were improper, depriving Mr. Sapp of his protections under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and under the corresponding provisions of the Ohio Constitution.
 {¶ 135} Sapp contends that the following jury instruction allowed the jury to convict him for aggravated murder on a finding of less than specific intent: "The Defendant's responsibility is not limited to the immediate or most obvious result of the Defendant's act. The Defendant is also responsible for the natural and foreseeable results that follow in the ordinary course of the events from the act."
 {¶ 136} At the outset, we note that Sapp failed to object to the trial court's jury instructions, thus we will review this argument under a plain error analysis. Crim.R. 30(A). State v. Wickline (1990),50 Ohio St.3d 114, 552 N.E.2d 913. Plain error does not exist unless it can be said that but for the error, the outcome of the trial clearly would have been different. State v. Long (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804.
 {¶ 137} Ohio law provides that "[a] single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge." State v. Jones, 91 Ohio St.3d 335,348-349, 2001-Ohio-57, quoting State v. Price (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 378 N.E.2d 772. The Ohio Supreme Court has recognized that the use of the foreseeability instruction in aggravated murder cases is questionable. See State v. Hanna, 95 Ohio St.3d 285, 295,2002-Ohio-2221, ¶ 54; State v. Goodwin, 84 Ohio St.3d 331, 346,1999-Ohio-356; State v. Burchfield, 66 Ohio St.3d 261, 263,1993-Ohio-44. The Court has concluded, however, that "[t]he use of that instruction * * * does not require reversal where the instructions as a whole make clear that the jury must find purpose to kill in order to convict." Hanna, 95 Ohio St.3d at 295, 2002-Ohio-2221 at ¶ 54, citing State v. Phillips, 74 Ohio St.3d 72, 100, 1995-Ohio-171. AccordState v. Frazier, 73 Ohio St.3d 323, 331, 1995-Ohio-235.
 {¶ 138} In this case, the trial court's use of the foreseeability instruction was not plain error. The trial court gave the standard Ohio Jury Instruction on causation after extensive instructions on purpose, intent, and prior calculation just before stating the causation language. The court further provided the following instruction regarding the purpose to cause the death of another: "If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be inferred from the use of the weapon." Accordingly, despite the questionable foreseeability instruction, the instructions as a whole made clear that the jury was required to find purpose to cause the death of another in order to convict. See State v.Goodwin, 84 Ohio St.3d at 346; State v. Phillips, 74 Ohio St.3d at 100.
 {¶ 139} The evidence at trial established that Sapp inflicted wounds with a large rock upon Morrow and Leach to cause their deaths, and similarly he inflicted wounds with a long piece of pipe upon Anderson to cause her death. Sapp confessed to throwing several large rocks at the heads of Morrow and Leach. DePriest testified that Sapp had used a substantial amount of force when he threw the rock at Morrow's head. Both girls died as a result of severe multiple blunt trauma to the head. Similarly, Sapp grabbed a five foot long piece of pipe and repeatedly struck Anderson in the back, shoulders, and face. Anderson died of significant trauma to the head and neck area. Accordingly, there was evidence produced at trial that Sapp had acted with specific intent, and we find no plain error.
 {¶ 140} Sapp also argues that the trial court deprived him of due process of law by giving the jury an improper instruction regarding reasonable doubt. The trial court's charge to the jury was as follows:
 {¶ 141} "A reasonable doubt is present when after you have carefully and (sic) considered and compared all the evidence you cannot say you are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense.
 {¶ 142} "Reasonable doubt is not mere possible doubt because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt.
 {¶ 143} "Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs."
 {¶ 144} Sapp argues that this statutory definition of reasonable doubt is constitutionally inadequate because it embodies a standard of proof below that required by the United States and Ohio Constitutions. According to Sapp, the "firmly convinced" language represents the less stringent standard of the clear and convincing evidence standard, and not the beyond a reasonable doubt standard. Sapp also contends that the "willing to act" language was too lenient to satisfy due process.
 {¶ 145} In this case, the trial court used the definition of "reasonable doubt" provided in R.C. 2901.05(D). The Ohio Supreme Court has approved the use of the statutory definition of reasonable doubt in jury instructions. See State v. Awkal, 76 Ohio St.3d 324, 1996-Ohio-395;State v. Maurer, 15 Ohio St.3d at paragraph six of the syllabus, andState v. Jenkins (1984), 15 Ohio St.3d 164, 473 N.E.2d 264, paragraph eight of the syllabus. In fact, the Ohio Supreme Court has repeatedly rejected arguments such as Sapp's and instead suggested that it is inadvisable to enlarge upon that definition. State v. Van Gundy,64 Ohio St.3d 230, 1992-Ohio-108. Accordingly, we cannot find that the definition of reasonable doubt, as provided in R.C. 2901.05(D), inaccurately imparts the concept of reasonable doubt and diminishes the State's requirement to prove guilt beyond a reasonable doubt.
 {¶ 146} Based upon the above discussion, we overrule Sapp's tenth assignment of error.
Sapp's eleventh assignment of error:
 {¶ 147} The trial court erred in failing to ask Appellant whether he (1) was aware that he had an absolute right to testify in (sic) his own behalf, and (2) knowingly, intelligently, and personally waived that right.
 {¶ 148} Sapp claims that the trial court erred in failing to ask him whether he was aware he had an absolute right to testify and in failing to verify that his decision to waive that right was made knowingly and intelligently. According to Sapp, the trial court's failure to do so violated his "rights to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution and under Section 9, Article I of the Ohio Constitution." We disagree.
 {¶ 149} Sapp did not testify at the jury trial in this matter. The Ohio Supreme Court has rejected the claim that a trial court must inform a defendant of his right to testify at trial. State v. Bey,85 Ohio St.3d 487, 499, 1999-Ohio-283. Furthermore, a trial court is not required to inquire whether the defendant's waiver of that right was done knowingly and intelligently. Id.
 {¶ 150} We note that there is nothing in the record of this case to suggest that Sapp misunderstood his rights, was unaware of his right to testify, or that trial counsel failed to advise him of his right to testify. Based on the foregoing, this court finds Sapp's eleventh assignment of error not well-taken.
Sapp's twelfth assignment of error:
 {¶ 151} A criminal appellant in a death penalty case is denied due process of law guaranteed under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution where its ability to conduct an independent analysis of the appropriateness of the death sentence is restricted by the Ohio Supreme Court's decision in State v. McGuire.
 {¶ 152} In this assignment of error, Sapp asserts that the Ohio Supreme Court decision in State v. McGuire, 80 Ohio St.3d 390,1997-Ohio-335, which held that juries and trial courts may not consider residual doubt as a valid mitigating factor, improperly restricts this court in its ability to conduct an independent analysis of the propriety of the death penalty. The court stated, "Residual doubt is not an acceptable mitigating factor under R.C. 2929.04(B), since it is irrelevant to the issue of whether the defendant should be sentenced to death." McGuire, supra, syllabus.
 {¶ 153} Regardless of whether the decision improperly restricts us, we are bound by Ohio Supreme Court law. We note that the offense in this instance was committed and Sapp was tried before McGuire was decided, however the Supreme Court of Ohio has held that McGuire applies retroactively. State v. Bey, 85 Ohio St.3d at 509. See, also, State v.Smith, 89 Ohio St.3d 323, 336, 2000-Ohio-166.
 {¶ 154} As such, Sapp's twelfth assignment of error is overruled.
Sapp's thirteenth assignment of error.
 {¶ 155} Insofar as trial counsel may be deemed to have waived or failed to preserve any issues addressed in this brief, Mr. Sapp was denied his right to effective assistance of counsel as guaranteed by theSixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution.
 {¶ 156} Sapp contends that, insofar as any of the errors of which he complains upon appeal were not raised in the trial court, trial counsel was ineffective. However, Sapp fails to cite to the record at all or provide this court with any specific instances of alleged ineffective assistance of counsel. Instead, he presents a "catch-all" assignment of error to present to us a general ineffective assistance of counsel argument.
 {¶ 157} Based upon this court's thorough review of the record, we find this assignment of error not well-taken.
Sapp's fourteenth assignment of error:
 {¶ 158} Cumulative error deprived Appellant of a fair trial in violation of his rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Ohio Constitutions.
 {¶ 159} Sapp alleges that the cumulative effect of all the errors resulted in denying him a fair trial. "Although violations of the Rules of Evidence during trial, singularly, may not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of errors during the course of a trial deprives a defendant of the constitutional right to a fair trial." State v. DeMarco (1987),31 Ohio St.3d 191, 509 N.E.2d 1256, paragraph two of the syllabus. The doctrine of cumulative error, however, is not applicable in the event appellant fails to establish multiple instances of harmless error during the course of the trial. State v. Garner, 74 Ohio St.3d 49, 64,1995-Ohio-168. In this case, we have not found any error, let alone harmless error. Therefore, the doctrine of cumulative error does not apply.
 {¶ 160} Sapp's fourteenth assignment of error is meritless.
Sapp's fifteenth assignment of error:
 {¶ 161} Ohio's death penalty statute as applied denies capitally convicted persons of due process, the right to meaningful appeal, and the ability to avoid cruel and unusual punishment because the universe of cases to be examined for review of proportionality does not include all those in which a capital specification has been charged.
 {¶ 162} Sapp claims that Ohio's mandatory death penalty proportionality review is unconstitutional because it only requires review of cases where the death penalty was actually imposed and it fails to permit consideration of those death penalty cases where a life sentence was imposed.
 {¶ 163} The Ohio Supreme Court has addressed this in State v.Steffen (1987), 31 Ohio St.3d 111, 509 N.E.2d 383, when it found that the proportionality review required by R.C. 2929.05(A) was satisfied by a review of those cases in which the death penalty was imposed. Furthermore, the Ohio Supreme Court has consistently determined on numerous occasions that the scheme established to review and compare death penalty cases is sufficient and constitutional. State v. LaMar,95 Ohio St.3d at 186, 2002-Ohio-2128 at ¶ 23; State v. Hartman,93 Ohio St.3d 274, 2001-Ohio-1580; State v. Moore, 81 Ohio St.3d 22, 39,1998-Ohio-441; State v. Davie, 80 Ohio St.3d 311, 328, 1997-Ohio-341;State v. Eley (1996), 77 Ohio St.3d 174, 672 N.E.2d 640; State v.Benner, 40 Ohio St.3d at 318. Therefore, this argument is meritless.
Sapp's sixteenth assignment of error:
 {¶ 164} Ohio's death penalty law is unconstitutional both in the abstract and as applied.
 {¶ 165} Sapp's final assignment of error contains twenty-four arguments why Ohio's death penalty scheme is unconstitutional. Specifically, Sapp contends the following as unconstitutional: (1) uncontrolled prosecutorial discretion in seeking the death penalty results in arbitrary, capricious, and discriminatory imposition; (2) proof of aggravating circumstances necessary during the guilt phase instead of the penalty phase; (3) no "effective narrowing" due to the allowable repetition of aggravated felony murder elements to serve as evidence of aggravating circumstances; (4) the trial court's lack of discretion in dismissing death specifications when a defendant elects to plead guilty; (5) no requirement of premeditation or deliberation for death sentence; (6) any presentence investigation report requested by the defendant must be submitted to the sentencer, regardless of whether there is prejudicial or irrelevant material in its contents; (7) the state is not required to prove the absence of mitigating factors; (8) proper and consistent weighing of mitigating and aggravating factors is not ensured; (9) the burden of proof is shifted during the mitigation phase to the defendant; (10) sympathy and mercy precluded by the jury; (11) no option for life sentence in the absence of mitigating factors; (12) sympathy and mercy precluded by the sentencer; (13) there is no option for the sentencer to review the appropriateness or the proportionality of the death sentence; (14) meaningful appellate review is not possible, since the jury is not required to identify the mitigating factors it found; (15) lack of appellate proportionality review, due to review only of cases where the death penalty has been imposed; (16) appellate review does not consider the appropriateness of the death penalty; (17) the death penalty violates the Eighth Amendment prohibition against cruel and unusual punishment; (18) the death penalty violates due process by interfering with the right to life, as it does not provide for the less restrictive means of a life sentence; (19) electrocution is cruel and unusual punishment; (20) infliction of extreme psychological, emotional and physical distress and anxiety prior to the electrocution; (21) Ohio's death penalty law violates the Organization of American States Treaty; (22) the death penalty violates the custom and practice of civilized nations; (23) the death penalty violates the United Nations Charter and other international treaties; and (24) other international treaties are violated by Ohio's application of the death penalty.
 {¶ 166} Within the first fifteen issues, all but the third issue were addressed and overruled in State v. Jenkins, 15 Ohio St.3d 164, andState v. Buell (1986), 22 Ohio St.3d 124, 489 N.E.2d 795. As we stated inState v. Chinn (Dec. 27, 1991), Montgomery App. No. 11835, the third issue has been addressed and overruled by the Ohio Supreme Court in Statev. Henderson (1989), 39 Ohio St.3d 24, 29, 528 N.E.2d 1237. Regarding the sixteenth issue, we note that Ohio's death penalty proportionality review has repeatedly been held to be constitutional. State v. Steffen,
31 Ohio St.3d at paragraph one of the syllabus, and State v. Loza,71 Ohio St.3d 61, 84, 1994-Ohio-410. In response to Sapp's seventeenth issue, the Ohio Supreme Court has found this issue to be moot, as death by electrocution does not violate the constitutional prohibition against cruel and unusual punishment, and in Ohio, an appellant has the option of being put to death by lethal injection. State v. Bayless (1976),48 Ohio St.2d 73, 2 O.O.3d 249, 357 N.E.2d 1035. The court in State v.Morales (1987), 32 Ohio St.3d 252, 260, 513 N.E.2d 267, addressed and overruled the issue of whether the death penalty inflicts extreme psychological, emotional, and physical distress. Finally, the remaining four issues have been overruled by Ohio courts. See, State v. Hartman,93 Ohio St.3d at 302; State v. Bey, 85 Ohio St.3d 487; State v. Phillips,74 Ohio St.3d at 103-104.
 {¶ 167} Because the Ohio Supreme Court has addressed all of these issues and found them without merit, we overrule Sapp's final assignment of error.
 Independent Review of Death Sentence {¶ 168} Having affirmed Sapp's aggravated murder conviction, pursuant to R.C. 2929.05, we must now conduct an independent determination of whether the evidence supports the aggravating circumstances Sapp was found guilty of committing, whether those aggravating circumstances outweigh the mitigating factors in this case beyond a reasonable doubt, and whether the sentence of death imposed upon Sapp is excessive or disproportionate to the penalty imposed in similar cases. Unlike all other appellate practice, this involves an independent factual analysis, in which no deference is given to the findings by the trial court.
 {¶ 169} First, we conclude beyond a reasonable doubt that the evidence presented at trial supports the statutory aggravating circumstances that Sapp was found guilty of committing. We agree with the jury and the trial court that William K. Sapp murdered the victim, Phree Morrow, in the course of committing rape or kidnaping, and that Sapp was the principal offender in the commission of that aggravated murder. R.C.2929.04(A)(7). We agree that Sapp murdered the victim, Martha Leach, in the course of committing rape or kidnaping, and that Sapp was the principal offender in the commission of that aggravated murder. R.C.2929.04(A)(7). We also agree that Sapp murdered the victim, Belinda Anderson, in the course of committing rape or kidnapping, and that Sapp was the principal offender in the commission of that aggravated murder. R.C. 2929.04(A)(7). Furthermore, we agree with the jury and the trial judge that Sapp killed Morrow, Leach and Anderson, and attempted to kill Pearson, as part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons. R.C. 2929.04(A)(5). As we stated in our previous discussion, we find the evidence sufficient to prove the course of conduct aggravating circumstance beyond a reasonable doubt.
 {¶ 170} We must next determine whether the aggravating circumstances which Sapp was found guilty of committing outweigh the mitigating factors in this case beyond a reasonable doubt. The aggravating circumstances must be weighed against the nature and circumstances of the offense, the history, character, and background of the offender, and all of the additional mitigating factors set forth in R.C. 2929.04(B), which include the following:
 {¶ 171} "(1) Whether the victim of the offense induced or facilitated it;
 {¶ 172} "(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;
 {¶ 173} "(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;
 {¶ 174} "(4) The youth of the offender;
 {¶ 175} "(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;
 {¶ 176} "(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;
 {¶ 177} "(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death."
 {¶ 178} We are mindful that only the aggravating circumstances may be weighed against the mitigating circumstances, State v. Davis (1988),38 Ohio St.3d 361, 367-373, 528 N.E.2d 925, and that the mitigating circumstances must be considered collectively. State v. Dickerson
(1989), 45 Ohio St.3d 206, 213, 543 N.E.2d 1250. Further, all mitigating evidence must be considered. State v. Lawrence (1989), 44 Ohio St.3d 24,27, 541 N.E.2d 451.
 {¶ 179} In our view, the factors enumerated in R.C. 2929.04(B)(1), (2), (4), (5), and (6) are entitled to no weight in mitigation. We find nothing mitigating in the nature and circumstances surrounding the incidents, as there was no evidence presented that the victims did anything to induce or facilitate the murders, and Sapp was not under duress, coercion or strong provocation. Sapp was thirty years old when the first offense at issue was committed, and thus his age is not a mitigating factor. Sapp has a criminal history, and for that reason we will not consider this to be a mitigating factor. Similarly, regarding the sixth factor, we find there was evidence that Sapp had been the principal offender or the sole offender in each of the offenses.
 {¶ 180} Sapp contends that his mental health issues resulted in a lack of substantial capacity, requiring great mitigating weight under R.C. 2929.04(B)(3). To establish this factor, Sapp presented testimony from clinical psychologist Kathleen J. Burch. Dr. Burch testified that Sapp was bipolar, suffered from antisocial personality disorder, and borderline personality disorder. At one point during her testimony, Dr. Burch stated "Within a reasonable degree of psychological certainty, I would say yes, Bill Sapp is impeded and impaired in his ability to appreciate the meaning and the consequences of his actions and to conform his behavior to the requirements of the law."
 {¶ 181} However, as a result of several tests she performed upon Sapp, Dr. Burch testified that there were indications that Sapp had been "malingering" or faking his mental health issues, although Dr. Burch would not make a diagnosis of "malingering." Dr. Burch concluded that the results from the Rorschach test indicate that Sapp was attempting to hide his "preoccupation with killing women." Sapp's answers to the MMPI II test reflected answers so unusual that Sapp was found to have endorsed many ideas that even severely mentally ill people do not endorse, which indicated to Dr. Burch that he was malingering. Additionally, Sapp's raw score indicated a "high likelihood of a faked bad profile." The results from Sapp's I.Q. test led Dr. Burch to believe that Sapp had been malingering, and that his scores were lower than they should have been. She estimated his I.Q. at approximately 90, which is at the bottom of the average range.
 {¶ 182} Moreover, Dr. Burch explained that individuals who suffer from borderline personality disorder often practice self-mutilation, so Sapp's scars could have resulted from wounds he inflicted upon himself. Most importantly, regarding Sapp's state of mind during the commission of the offenses, Dr. Burch conceded to the following on cross-examination by the State:
 {¶ 183} "Q. In a hypomanic or manic state, [an] individual does not have the ability to meticulously dispose of evidence, to wipe down bars from fingerprints, to eliminate and actually bring a group of people together and [c]ounsel them on what to say and what not to say to the police, to go back and meticulously create a grave and wrap a body in plastic bags. That would not be characteristic of what you're describing, would it, Doctor?
 {¶ 184} "A. No, it would not."
 {¶ 185} As to the factor under R.C. 2929.04(B)(3), whether, at the time of the offense, Sapp, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, we conclude that this factor was not proven by a preponderance of the evidence. While in her testimony Dr. Burch did indicate that Sapp suffered from mental health issues, Dr. Burch did not specifically link this finding to Sapp's conduct during any of the murders and, in fact, she specifically noted that had he been suffering a manic episode caused by the bipolarity, Sapp would not have been able to clean the scene and hide the evidence so well that he would not be caught for five or so years. Although Dr. Burch did express her opinion that Sapp lacked substantial capacity to conform his conduct to the requirements of the law, her testimony on cross-examination is proof otherwise. While we conclude that the mitigating factor under section R.C. 2929.04(B)(3) was not proven, we do find that Dr. Burch's testimony that Sapp suffered from mental disorders is entitled to some weight under R.C. 2929.04(B)(7), the "catch-all" provision.
 {¶ 186} Also to be considered under R.C. 2929.04(B)(7) is Sapp's character, background, and family history. A good portion of the evidence produced by Sapp during the penalty phase of the trial involved the life and history of Sapp's father, Kessler Lilly, with whom Sapp had enjoyed a close relationship. Accordingly, we do not find any of that history to be relevant for the purposes of mitigation. What is a mitigating factor is the history of Sapp's childhood, in particular his relationship with his mother, the physical and sexual abuse his mother perpetrated on him, and the neglect and abuse caused by Sapp's "stepmothers." Margaret Lilly, Sapp's mother, was described as a neglectful, oftentimes abusive mother who relied upon Sapp to care for her younger children. There was testimony that Margaret had sexually abused Sapp, and that she had burned Sapp's testicles with candle wax. Kessler Lilly testified that Margaret Lilly had a history of mental issues and that she had practiced witchcraft. According to Kessler, Margaret boiled a black cat and strung the bones into a "necklace" she wore around her neck while cursing God. Kessler stated that Margaret eventually left Kessler and the children and joined a motorcycle gang.
 {¶ 187} On rebuttal, Margaret denied that she was a witch, although she explained that she had studied witchcraft in the event that a member of her church would become involved in it. Although having been admitted for treatment into a mental health facility for six days in the past, Margaret denied having ongoing mental issues. She also denied having joined a motorcycle gang.
 {¶ 188} Kessler and Margaret had three children, and Margaret bore two additional children from other men. Sapp's younger brother Paul has been institutionalized since he was eighteen months old, after an incident where he was set on fire. Sapp was found to be responsible, although there was testimony that Margaret was to blame. Kessler Lilly, Jr. ("J.R."), Sapp's other brother, is schizophrenic and lives with his father, unable to care for himself. Sapp's younger half-brother Charles drowned in a creek while Margaret, who was supposed to be caring for him, slept. Nothing was mentioned about Sapp's other half-sibling, Catrina. Sapp and his brothers did spend some time in their youth under the care of children's services.
 {¶ 189} We find that the above-mentioned factors are entitled to some weight under the catch-all provision of R.C. 2929.04(B)(7). Nevertheless, we find these factors are entitled to only minimal weight due to the fact that many individuals suffer similar hardships in life and do not go on to commit a series of aggravated murders. Instead, we find nothing in Sapp's history, character or background that lessens his moral culpability in any significant way.
 {¶ 190} Having independently reviewed and weighed all of the evidence in the record, and having considered both the offenses and the offender, we conclude, beyond a reasonable doubt, that the aggravating circumstances Sapp was found guilty of committing outweigh the mitigating factors in this case. Sapp's evidence of mitigation pales in comparison to the statutory aggravating circumstances Sapp was found guilty of committing. Those aggravating circumstances, by their very nature, encompass among its elements the injuries and serious physical harm inflicted upon Sapp's victims during the commission of a rape or a kidnapping. The injuries and physical harm to the victims in this case were shockingly violent, and demonstrate a profound disrespect for human life. We agree with the trial court that the statutory aggravating circumstances proven in this case are grave and deserve great weight. Accordingly, we find that with respect to the aggravated murder of Phree Morrow, the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. We find that with respect to the aggravated murder of Martha Leach, the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. Similarly, with respect to the aggravated murder of Belinda Anderson, the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt.
 {¶ 191} Under the third and final prong of our independent review, we must determine whether the imposition of the death penalty in the instant case was excessive or disproportionate in comparison to other death penalty cases from this appellate district. See Steffen,31 Ohio St.3d at 123; R.C. 2929.05(A).
 {¶ 192} This court has previously affirmed death sentences in cases involving the murder of two or more persons in one course of conduct. See State v. Keene (Sept. 20, 1996), Montgomery App. No. 14375;State v. Kinley (June 24, 1993), Clark App. No. 2826; State v. Moreland
(Sept. 16, 1988), Montgomery App. No. 9907; State v. Hooks (Oct. 22, 1986), Montgomery App. No. 9275. This court has also previously affirmed death sentences in cases involving felony murder aggravating circumstances. See: State v. Myers (Feb. 12, 1999), Greene App. No. 96-CA-38; State v. Bays (Jan. 30, 1998), Greene App. No. 95-CA-118; Keene, supra; State v. Brewer (August 26, 1988), Greene App. No. 87-CA-67; Hooks, supra.
 {¶ 193} Accordingly, Sapp's death sentence is appropriate, proportionate, and not excessive when compared to the penalties we have upheld in similar cases. Therefore, we affirm Sapp's conviction and sentence of death in all respects.
BROGAN, J., and FAIN, J., concur.
[1] Sapp lists assignments of error one through sixteen, but does not include in his brief or his reply brief even a reference to assignment of error number nine.
[2] Crim.R. 12 was amended in July 2001, and the relevant section now appears as Crim.R. 12(F).